**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION**

Dennis D. Phillips,                      :            Case No. 5:12 CV 2085

                              :

         Plaintiff,               :

                              :

v.                                 :

                              :

Commissioner of Social Security,     :           **REPORT AND**

         Defendant,          :           **RECOMMENDATION**

## I. INTRODUCTION

Plaintiff Dennis D. Phillips ("Plaintiff") seeks judicial review pursuant to 42 U.S.C. § 405(g) of

Defendant Commissioner's ("Defendant" or "Commissioner") final determination denying his claim

for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§

416(i), and 423 (Docket No. 1). Pending are the parties' Briefs on the Merits (Docket Nos. 14 and 15)

and Plaintiff's Reply (Docket No. 18). For the reasons that follow, the undersigned Magistrate

recommends that the decision of the Commissioner be affirmed.

## II. PROCEDURAL BACKGROUND

1

On May 11, 2009, Plaintiff filed an application for a period of DIB under Title II of the Social Security Act, 42 U.S.C. §§ 416(i) and 423 (Docket No. 10, p. 136 of 1826). In his application, Plaintiff alleged a period of disability beginning December 3, 2007 (Docket No. 10, p. 136 of 1826). Plaintiff's claim was denied initially on July 23, 2009 (Docket No. 10, p. 94 of 1826), and upon reconsideration on February 17, 2010 (Docket No. 10, p. 110 of 1826). Plaintiff thereafter filed a timely written request for a hearing on February 25, 2010 (Docket No. 10, p. 117 of 1826).

On January 18, 2011, Plaintiff appeared with counsel for a hearing before Administrative Law Judge Dwight D. Wilkerson ("ALJ Wilkerson") (Docket No. 10, pp. 43-88 of 1826). Also appearing at the hearing was an impartial Vocational Expert ("VE") (Docket No. 10, pp. 75-88 of 1826). ALJ Wilkerson found Plaintiff to have a severe combination of status post two right rotator cuff surgeries, adjustment disorder with depressed mood, and pain disorder associated with both psychological factors and a general medical condition with an onset date of December 3, 2007 (Docket No. 10, p. 26 of 1826).

Despite these limitations, ALJ Wilkerson determined, based on all the evidence presented, that Plaintiff had not been disabled within the meaning of the Social Security Act at any time from the alleged onset date through Plaintiff's date last insured, September 30, 2009 (Docket No. 10, p. 26 of 1826). ALJ Wilkerson found Plaintiff had the residual functional capacity to perform light work with the following limitations:

1.  Plaintiff cannot climb ladders, ropes, or scaffolds

2.  Plaintiff cannot squat or kneel

3.  Plaintiff cannot perform any overhead reaching with the dominant upper right extremity

4.  Plaintiff cannot work in an environment where the temperature is below forty-five

degrees

5.      Plaintiff must avoid all exposure to hazards

6.      Plaintiff can perform simple, routine tasks in a stable environment, with occasional, superficial interaction with others

7.      Plaintiff cannot lift more than two pounds with his dominant hand and cannot perform any job that requires sustained use of his dominant right hand

8.      Plaintiff must avoid concentrated exposure to vibrations

9.      Plaintiff must be able to sit down for ten minutes every hour

(Docket No. 10, p. 29 of 1826). Plaintiff's request for benefits was therefore denied (Docket No. 10, p. 35 of 1826).

On August 13, 2012, Plaintiff filed a Complaint in the Northern District of Ohio, Eastern Division, seeking judicial review of his denial of DIB (Docket No. 1). In his pleading, Plaintiff alleged: (1) the ALJ committed reversible error by not finding Plaintiff's migraine headaches to be a severe impairment and by failing to include additional limitations in the residual functional capacity assessment to account for Plaintiff's headaches; (2) the ALJ failed to include all relevant impairments in the hypothetical question posed to the VE; and (3) the ALJ relied upon flawed testimony from the VE with regard to Plaintiff's ability to perform other work (Docket No. 14, pp. 10-18 of 18). Defendant filed its Answer on November 14, 2012 (Docket No. 9).

### III. FACTUAL BACKGROUND

#### A.    ADMINISTRATIVE HEARING

An administrative hearing convened on January 18, 2011, in Akron, Ohio (Docket No. 10, pp. 43-88 of 1826). Plaintiff, represented by counsel Chad Delesk, appeared and testified (Docket No. 10, pp. 43-75 of 1826). Also present and testifying was VE Ted Macy ("VE Macy") (Docket No. 10, pp.

3

75-88 of 1826).

1.   **PLAINTIFF'S TESTIMONY**

At the time of the hearing, Plaintiff was a fifty-five-year-old male who resided with his wife, daughter, and two sons (Docket No. 10, pp. 48-49 of 1826). Plaintiff never graduated from high school, but testified that he earned his GED within several years after leaving school (Docket No. 10, p. 49 of 1826).

With regard to his past employment, Plaintiff indicated that he last worked in late 2008 at Walmart, for three to four weeks (Docket No. 10, p. 49 of 1826). According to Plaintiff, he did janitorial work, including mopping floors, cleaning toilets, and general scrubbing (Docket No. 10, p. 50 of 1826). Plaintiff worked full-time, but had to quit because the job was wearing him out (Docket No. 10, p. 50 of 1826).

Prior to working at Walmart, Plaintiff worked for J&J Refuse, first as a truck driver and then, after a workplace injury to his right shoulder, as a line worker on light duty (Docket No. 10, p. 52 of 1826). According to Plaintiff, working on the line meant that he worked the conveyor belt and turned bottles that were to be recycled (Docket No. 10, p. 52 of 1826). Plaintiff was able to sit on a stool while he did this job (Docket No. 10, p. 77 of 1826). Plaintiff stated that he worked twenty-four hours per week for ten dollars per hour (Docket No. 10, p. 76 of 1826). When asked by both ALJ Wilkerson and his own counsel, Plaintiff indicated that, physically, he could have continued working, but was terminated (Docket No. 10, pp. 53, 67 of 1826).

Plaintiff testified that, from 1975-2007, he worked approximately six months out of every year (Docket No. 10, pp. 54-55 of 1826). Plaintiff stated that his wife worked to help make ends meet (Docket No. 12, p. 57 of 1826). Plaintiff was also questioned about several years during which no

4

earnings were reported (Docket No. 10, p. 55 of 1826). Although somewhat unclear on the details,

Plaintiff stated that he was involved in a car accident which prevented him from working, and also

noted that his work truck would frequently break down, preventing him from working (Docket No. 10,

pp. 56-58 of 1826).

> When asked to describe the primary reason for his inability to work, Plaintiff stated
>
> [d]ealing with – in my opinion, – dealing with a bunch of idiots, you know. I cannot stand
> anybody [who thinks] that they know the right way. That's it, you know. So many people
> are not open minded whatsoever, and they just get me mad, you know, and they get mad
> like now, I just walk in another room. I have people at my house get me mad all the time.
> I scream at a lot of people.

(Docket No. 10, p. 59 of 1826). According to Plaintiff, this inability to deal with people stems from the

pain in his arm (Docket No. 10, p. 59 of 1826).

> Plaintiff gave testimony concerning a number of his alleged impairments, including his right

arm pain, depression, and migraines (Docket No. 10, pp. 60-75 of 1826). With regard to his right arm

pain, Plaintiff stated that he was originally right-handed but now, given his pain level, is left-handed

(Docket No. 10, p. 61 of 1826). Plaintiff testified that he can lift, at most, two pounds (Docket No. 10,

p. 60 of 1826). Plaintiff indicated that he cannot lift a gallon of milk, or even five pounds, and stated

that he was recently in pain when he tried to lift a bottle of ketchup (Docket No. 10, p. 60 of 1826).

Plaintiff also indicated that he was prone to dropping things (Docket No. 10, pp. 63-64 of 1826).

However, Plaintiff also testified that he can always use his right arm to support himself (Docket No.

10, p. 60 of 1826). He must always keep his arm below his shoulder and cannot do any overhead

reaching (Docket No. 10, p. 62 of 1826). Plaintiff also indicated that he has to sit down for at least ten

minutes every hour because he gets tired and worn out all the time (Docket No. 10, pp. 61-62 of 1826).

> With regard to his depression, Plaintiff stated that he was not depressed before his injury and

testified that he feels that his depression stems from both the injury itself and his subsequent limitations (Docket No. 10, p. 68 of 1826). Plaintiff indicated that his basic personal hygiene is limited, and he sometimes shaves only once a week and wears the same clothes three or four days in a row (Docket No. 10, p. 68 of 1826). Plaintiff stated that his wife sometimes has to tell him when to shower (Docket No. 10, p. 69 of 1826). When asked why he has to be reminded of these basic personal hygiene tasks, Plaintiff responded, "[w]ell, why in the hell do I really care? I don't care. You know, I just want to be left alone. That's all I want. That's all I ever wanted, just – I hurt, and I get tired of it, and it's so much easier to deal with, with doing nothing, just being quiet" (Docket No. 10, p. 69 of 1826).

Plaintiff also testified that he has difficulty concentrating, keeping on task, and focusing (Docket No. 10, p. 70 of 1826). Plaintiff forgets "different things" (Docket No. 10, p 70 of 1826). He stated that he does not read, and only sometimes watches television, but not the news (Docket No. 10, pp. 70-71 of 1826). Plaintiff indicated that he is less social since his injury, only visiting with family and friends on a sporadic basis (Docket No. 10, pp. 71-72 of 1826). Plaintiff did state that he visits with his son's friends when they come over (Docket No. 10, pp. 70-71 of 1826).

When asked if he leaves the house, Plaintiff stated that he only leaves to go to church and to the grocery store, although he usually stays in the car at the grocery store (Docket No. 10, p. 72 of 1826). When asked why he stayed in the car, Plaintiff responded that he does not feel like "taking a cart, pushing it all around the store, picking up stuff, and everybody just stays in your damn way" (Docket No. 10, p. 72 of 1826). Plaintiff also stated that people at the grocery store irritate him (Docket No. 10, p. 72 of 1826).

With regard to his migraines, Plaintiff stated that they come and go (Docket No. 10, p. 73 of

6

1826). When he has them, they often appear three times per week, but then they go away for longer periods of time (Docket No. 10, p. 73 of 1826). At the time of the hearing, Plaintiff indicated that he had a headache the day before the hearing, but prior to that, had not had one for a few months (Docket No. 10, p. 73 of 1826). Plaintiff later stated that he usually goes one month between migraines (Docket No. 10, p. 74 of 1826). During his migraines, Plaintiff takes the prescription medication Maxalt and goes into a dark room (Docket No. 10, p. 74 of 1826).

Plaintiff also testified as to his residual functional capacity. Plaintiff stated that he was not more active in 2009 than he was at the time of the hearing (Docket No. 10, p. 66 of 1826). However, Plaintiff indicated that he still drives, goes to his children's sporting events, and does some chores around the house (Docket No. 10, p. 66 of 1826). Plaintiff also testified that he is able to mow his grass using a riding lawnmower, but indicated that it takes him two days because he has more than an acre of property and the vibrations from the lawnmower bother his arm (Docket No. 10, pp. 66-67 of 1826). Plaintiff stated that he does the laundry, but can only take the clothes and put them in the washer and dry; he cannot fold (Docket No. 10, pp. 69-70 of 1826). Plaintiff also testified that he cooks (Docket No. 10, p. 70 of 1826).

### 2. VOCATIONAL EXPERT TESTIMONY

Having familiarized himself with Plaintiff's file and vocational background prior to the hearing, the VE described Plaintiff's past work as a truck driver as medium and semi-skilled and as a material handler as heavy and semi-skilled (Docket No. 10, pp. 78-79 of 1826).

ALJ Wilkerson then posed his first hypothetical question:

> Assume an individual with the Claimant's vocational profile in terms of age, education and work experience who is limited to light work; cannot climb ladders, ropes or scaffolds; can do no squatting or kneeling; and can do no overhead reaching with the dominant right upper extremity; cannot work in temperatures below 45 degrees; and must avoid all

7

exposure to hazards . . . and . . . [is] able to perform simple routine tasks in a stable environment, with occasional superficial interaction with others. Would there be jobs in the state or national economy that such a person could perform?

(Docket No. 10, p. 80 of 1826). Taking into account these limitations, the VE testified that such an individual would be able to perform other work in the economy, including: (1) bench assembler, listed under DOT 706.684-022, for which there are 111,000 positions nationally and 4,000 positions locally; and (2) wire worker, listed under DOT 728.684-022, for which there are 100,000 positions nationally and 3,000 locally (Docket No. 10, p. 80 of 1826).

ALJ Wilkerson then added to his hypothetical, stating, "[i]f you added in a restriction . . . where the person could do no lifting over two pounds with the dominant right hand and also could really do no sustained use of the right dominant arm . . . Would there still be jobs that such an individual could perform?" (Docket No. 10, pp. 80-81 of 1826). VE Macy indicated that both the bench assembler and wire worker positions were out, given their requirement of occasional use of both hands (Docket No. 10, p. 81 of 1826). The VE stated that there were other jobs that this hypothetical person could perform, including: (1) gate tender, listed under DOT 372.667-030, for which there are 25,000 positions nationally and 850 positions locally; and (2) security guard, listed under DOT 372.667-034, for which there are 48,000 positions nationally and 2,000 locally (Docket No. 10, pp. 81-82 of 1826).[1]

In a third hypothetical, the ALJ added "the need to avoid concentrated exposure to vibration" (Docket No. 10, p. 82 of 1826). VE Macy stated that this additional limitation would make no difference in the availability of other work for the hypothetical individual (Docket No. 10, p. 82 of

---

[1] With regard to the gate tender position, VE Macy did not include any of the semi-skilled or outdoor jobs listed under that category, given Plaintiff's limitations (Docket No. 10, p. 81 of 1826).

1826). ALJ Wilkerson then added "the need to be able to sit down for approximately ten minutes every hour" (Docket No. 10, p. 82 of 1826). Again, the VE indicated that this limitation would have no effect on the other work available (Docket No. 10, p. 82 of 1826).

During cross-examination, Plaintiff's counsel expanded upon the ALJ's second hypothetical, adding, "what if [the hypothetical person was] severely limited in [his] ability to grasp and handle with [his] right arm extremity" (Docket No. 10, pp. 83-84 of 1826). Counsel shortly thereafter questioned "if somebody wasn't able to grasp or handle *at all* with the right hand, then [do] you think those jobs would be precluded" (Docket No. 10, p. 84 of 1826) (emphasis added). In response to both of these hypothetical questions, VE Macy testified that the other work would be greatly impacted, stating "[i]f one hand wasn't usable at all . . . I think most of these [other work] jobs would be eliminated" (Docket No. 10, p. 84 of 1826).

Counsel then referenced ALJ Wilkerson's second hypothetical, which restricted the hypothetical person to "no sustained use of the right dominant arm," questioning whether the VE's answer was consistent with that limitation (Docket No. 10, p. 84 of 1826). VE Macy indicated that he took "sustained use" to mean "at least occasional" (Docket No. 10, p. 84 of 1826). Therefore, the VE indicated that his answers regarding other available work were consistent with the ALJ's proffered limitation (Docket No. 10, p. 84 of 1826).

In a third hypothetical, Plaintiff's counsel limited the hypothetical individual to "no contact with the public" (Docket No. 10, p. 86 of 1826). In response to this limitation, VE Macy indicated that only the security guard and gate tender jobs would be affected; the bench assembler and wire worker positions would remain (Docket No. 10, p. 86 of 1826). Counsel also questioned the VE as to the acceptable number of employee absences, to which the VE testified that most employers would accept

9

at least one absence, maybe two, per month (Docket No. 10, pp. 85-86 of 1826).

**C.     MEDICAL RECORDS[2]**

Plaintiff's medical records date back to October 7, 2006, when Plaintiff visited an Immediate Care Center complaining of continuing pain three weeks after a workplace accident (Docket No. 10, p. 466 of 1826). Plaintiff stated that he injured his arm when he slipped and fell (Docket No. 10, p. 466 of 1826). A staff physician noted possible micro tears to the muscle fibers of Plaintiff's biceps and triceps and diagnosed Plaintiff with a right arm strain (Docket No. 10, p. 466 of 1826).

On October 17, 2006, Plaintiff saw Dr. Michael Marvin, MD ("Dr. Marvin") complaining of right arm pain (Docket No. 10, p. 333 of 1826). According to physician records, Plaintiff "injured his right elbow on [September 21, 2006], while working. He states he was pulling Styrofoam out of the back of his truck with a hook. He slipped and started to fall and . . . jerked the right shoulder and right elbow" (Docket No. 10, p. 333 of 1826). Dr. Marvin diagnosed Plaintiff with right shoulder and elbow strain as well as ulnar neuropathy (Docket No. 10, p. 333 of 1826). Plaintiff was sent for an MRI, placed on work restriction, and ordered to ice his shoulder and do home exercises (Docket No. 10, p. 334 of 1826).

Plaintiff underwent an MRI of his right shoulder on October 27, 2006 (Docket No. 10, p. 285 of 1826). The scan showed a small full thickness tear of the anterior leading free edge of the supraspinatus tendon as well as associated tendonitis and tendinopathy (Docket No. 10, p. 285 of 1826).

Plaintiff returned to Dr. Marvin on October 30, 2006 (Docket No. 10, p. 332 of 1826). Plaintiff

_____

[2] Plaintiff's submitted medical record is vast, spanning over 1,500 pages. It must be noted that some of these medical documents appear in the record multiple times. Therefore, please note that documents will be cited only to their first appearance in the record.

was still experiencing tenderness over his right shoulder area and had trouble with exertional rotation (Docket No. 10, p. 332 of 1826). Plaintiff's shoulder had abduction to only ninety degrees and flexion to one-hundred seventy degrees (Docket No. 10, p. 332 of 1826). Dr. Marvin diagnosed Plaintiff with a right rotator cuff tear, right elbow strain, and ulnar neuropathy (Docket No. 10, p. 332 of 1826).

On November 10, 2006, Dr. Marvin referred Plaintiff to Dr. Mark J. Shepard, MD ("Dr. Shepard") for a consultation (Docket No. 10, p. 317 of 1826). Dr. Shepard noted that Plaintiff's right shoulder had full passive and active range of motion, but there was significant pain present with full forward flexion (Docket No. 10, p. 317 of 1826). Impingement signs were positive with a drop arm test, and Plaintiff experienced pain and weakness on resisted supraspinatus testing (Docket No. 10, p. 317 of 1826). Plaintiff also had tenderness upon palpation (Docket No. 10, p. 317 of 1826). In addition to his MRI results, Plaintiff's x-rays revealed a Type III acromion with mild AC arthrosis (Docket No. 10, p. 317 of 1826). Dr. Shepard diagnosed Plaintiff with a right shoulder rotator cuff tear and recommended surgery (Docket No. 10, p. 317 of 1826). On November 20, 2006, Dr. Shepard performed a right shoulder arthroscopy, arthroscopic subacromial decompression, and a clavicle excision on Plaintiff's right shoulder (Docket No. 10, pp. 320-21 of 1826).

Plaintiff returned to Dr. Shepard for a follow up appointment on December 6, 2006 (Docket No. 10, p. 318 of 1826). Dr. Shepard indicated that Plaintiff's x-rays revealed excellent arthroscopic decompression and distal clavicle excision (Docket No. 10, p. 318 of 1826). According to Dr. Shepard, Plaintiff's rotator cuff was repaired and Plaintiff should continue passive stretching with plans to move on to active motion in another month (Docket No. 10, p. 318 of 1826).

On January 17, 2007, Plaintiff returned to Dr. Shepard (Docket No. 10, p. 301 of 1826). Appointment notes indicate that Plaintiff's shoulder was improving in physical therapy, but Plaintiff

11

still only had passive forward flexion to sixty degrees (Docket No. 10, p. 301 of 1826). Impingement signs with rotator cuff weakness were still noted (Docket No. 10, p. 301 of 1826). Dr. Shepard reported that Plaintiff had begun developing significant stiffness in his shoulder, even with his physical therapy (Docket No. 10, p. 301 of 1826). Plaintiff was ordered to begin active range of motion exercises (Docket No. 10, p. 301 of 1826). On January 18, 2007, Plaintiff underwent radiology testing of his right shoulder, which revealed a small spur present on the tip of the cordnoid process of the ulna (Docket No. 10, p. 286 of 1826).

On February 28, 2007, Plaintiff returned to Dr. Shepard, who noted that Plaintiff's shoulder was still slowly improving (Docket No. 10, p. 444 of 1826). Plaintiff's passive and active forward flexion had improved to one-hundred degrees; however, Plaintiff still had positive impingement signs with pain and weakness present on resisted supraspinatus testing (Docket No. 10, p. 444 of 1826). Plaintiff's shoulder also had mild tenderness upon palpation (Docket No. 10, p. 444 of 1826). Dr. Shepard noted that Plaintiff's rotator cuff appeared to be healed, but reported that Plaintiff still had some stiffness and should continue with aggressive stretching physical therapy (Docket No. 10, p. 444 of 1826).

By April 10, 2007, Dr. Shepard noted that Plaintiff's passive and active forward flexion had increased to one-hundred eighty degrees (Docket No. 10, p. 567 of 1826). However, Plaintiff still had positive impingement signs, accompanied by rotator cuff weakness (Docket No. 10, p. 567 of 1826). Dr. Shepard also noted that Plaintiff had developed significant stiffness in his shoulder, despite the fact that the rotator cuff was healed (Docket No. 10, p. 567 of 1826). Dr. Shepard noted that surgery was likely necessary to release Plaintiff's shoulder stiffness (Docket No. 10, p. 567 of 1826). Plaintiff underwent this surgery on April 23, 2007 (Docket No. 10, pp. 485-88 of 1826). By May 2, 2007,

Plaintiff had nearly a full range of motion in his shoulder (Docket No. 10, p. 566 of 1826).

Plaintiff returned to Dr. Shepard on July 13, 2007, still presenting with positive impingement signs and rotator cuff weakness (Docket No. 10, p. 518 of 1826). Plaintiff had a forward flexion to one-hundred twenty degrees and stated that his shoulder motion had significantly improved in physical therapy (Docket No. 10, p. 518 of 1826). By July 27, 2007, Plaintiff's forward flexion had increased to one-hundred forty degrees (Docket No. 10, p. 505 of 1826). Plaintiff was still experiencing positive impingement signs with pain and weakness with resisted supraspinatus testing and mild tenderness upon palpation (Docket No. 10, p. 505 of 1826). Dr. Shepard recommended that Plaintiff continue his stretching routine (Docket No. 10, p. 505 of 1826).

On September 7, 2007, Dr. Shepard reported that, while Plaintiff's passive and active forward flexion had increased to one-hundred forty-five degrees, Plaintiff's shoulder had become inflamed (Docket No. 10, p. 563 of 1826). Plaintiff was given Lidocaine and Celestone and experienced moderate and immediate pain relief (Docket No. 10, p. 563 of 1826). Plaintiff was started on an at-home medication routine to reduce the swelling (Docket No. 10, p. 563 of 1826).

By October 19, 2007, Plaintiff's active and passive flexion had increased to one-hundred sixty degrees, despite positive impingement signs, pain and weakness on resisted supraspinatus testing, and mild tenderness upon palpation (Docket No. 10, p. 562 of 1826). Dr. Shepard noted that Plaintiff's shoulder was making slow, but reasonable, progress (Docket No. 10, p. 562 of 1826). Plaintiff was told that he was approaching maximum medical improvement ("MMI") and would likely have permanent work restrictions (Docket No. 10, p. 562 of 1826).

A progress note from Spectrum Therapy and Wellness ("Spectrum"), Plaintiff's physical therapy provider, dated November 30, 2007, noted that Plaintiff had sixty-three visits to date and had

made extremely slow progress (Docket No. 10, p. 579 of 1826). The therapist noted that Plaintiff's

effort and motivation during his therapy sessions was sporadic, with frequent refusal to participate in

the exercises (Docket No. 10, p. 579 of 1826). The therapist stated that Plaintiff "refuses [to

participate] based upon his pain level, however, displays no outward physical signs of a high pain

level" (Docket No. 10, p. 579 of 1826). Plaintiff claimed to not be able to lift even a five-pound bag of

sugar or the telephone, but could lift to at least ninety degrees and exercise against at least five pounds

of resistence in the water during his therapy sessions (Docket No. 10, p. 579 of 1826). The therapist

noted that overall, "it does not seem [Plaintiff's] subjective reports equal that of his observed

behaviors" (Docket No. 10, p. 579 of 1826).

Plaintiff returned to Dr. Shepard on November 30, 2007, claiming that his shoulder was still

symptomatic (Docket No. 10, p. 561 of 1826). At this time, Plaintiff still had limited forward flexion,

positive impingement signs, pain and weakness upon resisted testing, and tenderness upon palpation

(Docket No. 10, p. 5561 of 1826). Dr. Shepard told Plaintiff that he had reached MMI and issued

permanent restrictions (Docket No. 10, p. 561 of 1826). Dr. Shepard also suggested that Plaintiff

attend vocational rehabilitation, given these permanent restrictions (Docket No. 10, p. 561 of 1826).

Plaintiff was referred to vocational rehabilitation services through Independent Vocational Services,

Inc. ("IVS") on January 29, 2008 (Docket No. 10, p. 607 of 1826). A February 15, 2008, report from

IVS indicated that Plaintiff would benefit from a facility-based clerical adjustment, which would allow

Plaintiff to improve his stamina to eventually work an eight-hour workday as well as increase his basic

computer skills (Docket No. 10, pp. 611-12 of 1826). Plaintiff's IVS file was closed on October 6,

2008, because Plaintiff returned to work (Docket No. 10, p. 1332 of 1826).

On May 9, 2008, Plaintiff saw Dr. Terrance L. Pansino, MD ("Dr. Pansino") complaining of a

14

left-sided headache (Docket No. 10, p. 1687 of 1826). Plaintiff was treated for a migraine with the prescription medication Maxalt (Docket No. 10, p. 1687 of 1826). Plaintiff returned to Dr. Pansino on June 6, 2008, again complaining of a migraine headache (Docket No. 10, p. 1686 of 1826). Again, Plaintiff's headache was resolved with Maxalt therapy (Docket No. 10, p. 1686 of 1826).

Plaintiff did not return to Dr. Shepard until January 14, 2009 (Docket No. 10, p. 1337 of 1826). Plaintiff still presented with continued loss of full forward flexion motion, positive impingement signs, pain and weakness on resisted supraspinatus testing, and tenderness upon palpation (Docket No. 10, p. 1337 of 1826). Plaintiff was given Lidocaine and Celestone, which provided moderate and immediate relief (Docket No. 10, p. 1337 of 1826).

On April 29, 2009, Plaintiff saw Dr. Pansino complaining of chronic right shoulder pain and migraine headaches (Docket No. 10, p. 284 of 1826). At that time, Plaintiff had difficulty with elevating his arm beyond ninety degrees (Docket No. 10, p. 284 of 1826). Dr. Pansino prescribed Lyrica for Plaintiff's shoulder pain (Docket No. 10, p. 284 of 1826). Plaintiff returned to Dr. Pansino on September 22, 2009, still complaining of persistent right shoulder pain (Docket No. 10, p. 1677 of 1826). Plaintiff seemed to experience pain if he elevated his arm above thirty degrees (Docket No. 10, p. 1677 of 1826). Dr. Pansino wondered "how much of this pain [was] neuropathic" (Docket No. 10, p. 1677 of 1826). The doctor increased Plaintiff's dosage of Lyrica and refilled Plaintiff's prescription for Maxalt (Docket No. 10, p. 1677 of 1826). Plaintiff saw Dr. Pansino on October 20, 2009, again complaining of right shoulder pain (Docket No. 10, p. 1777 of 1826). Plaintiff indicated that he could no longer qualify his pain on a scale of one to ten (Docket No. 10, p. 1777 of 1826). Dr. Pansino again wondered about the neuropathic component of Plaintiff's pain, noting that Plaintiff had subjectively improved on the Lyrica (Docket No. 10, p. 1777 of 1826).

15

On October 23, 2009, Plaintiff saw Dr. David P. Gutlove ("Dr. Gutlove") (Docket No. 10, pp. 1793-95 of 1826). Dr. Gutlove noted that Plaintiff still had a diminished range of motion of his right upper extremity including flexion, extension, internal and external rotation, abduction, and adduction (Docket No. 10, p. 1794 of 1826). Dr. Gutlove noted that Plaintiff's range of motion was thirty to forty percent of the predicted range (Docket No. 10, p. 1794 of 1826). However, Plaintiff's strength was four out of a possible five (Docket No. 10, p. 1794 of 1826). Dr. Gutlove recommended Plaintiff undergo a nerve conduction study (Docket No. 10, p. 1794 of 1826).

Plaintiff underwent this test on November 17, 2009 (Docket No. 10, p. 1789 of 1826). The study was normal, showing no electrophysiologic evidence of right-sided cervical radiculopathy (Docket No. 10, p. 1789 of 1826). On that same date, Plaintiff underwent a second MRI of his shoulder (Docket No. 10, p. 1796 of 1826). The test showed an intact rotator cuff, edema in the supraspinatus muscle near the musculotendinous junction, post-surgical changes, and a subchondral cyst in the humeral head (Docket No. 10, p. 1796 of 1826).

Plaintiff returned to Dr. Pansino on November 19, 2009, complaining of right arm pain (Docket No. 10, p. 1804 of 1826). He was ordered to stay on the Lyrica and incorporate a Flector pain patch (Docket No. 10, p. 1804 of 1826). On January 4, 2010, Dr. Pansino increased Plaintiff's dosage of Lyrica (Docket No. 10, p. 1803 of 1826). During a January 15, 2010, appointment with Dr. Pansino, Plaintiff rated his arm pain as a six to eight out of a possible ten (Docket No. 10, p. 1808 of 1826). Despite doing well on his medication regimen, Plaintiff indicated he would like a second opinion (Docket No. 10, p. 1808 of 1826).

On February 12, 2010, Plaintiff saw Dr. Gerald Klimo, MD ("Dr. Klimo") (Docket No. 10, pp. 1821-22 of 1826). Plaintiff reported a sharp pain in his right shoulder which was moderately alleviated

16

by heat and medication (Docket No. 10, p. 1821 of 1826). Dr. Klimo noted that Plaintiff's right shoulder had a limited range of motion and diffuse tenderness upon palpation (Docket No. 10, p. 1821 of 1826). However, Plaintiff's rotator cuff strength was four out of a possible five, and had a passive right shoulder elevation to one-hundred seventy-five degrees (Docket No. 10, p. 1821 of 1826). Dr. Klimo opined that since Plaintiff had not responded to either conservative or surgical treatments, Plaintiff was not a candidate for any further surgery (Docket No. 10, p. 1822 of 1826).

Plaintiff returned to Dr. Pansino on April 8, 2010, complaining of chronic right shoulder pain (Docket No. 10, p. 1803 of 1826). Plaintiff noted that he was doing better on the increased dosage of Lyrica (Docket No. 10, p. 1803 of 1826). Plaintiff saw Dr. Pansino on June 3, 2010, and July 29, 2010, both times complaining of right shoulder pain (Docket No. 10, pp. 1825-26 of 1826). Plaintiff was given a refill of his Lyrica (Docket No. 10, p. 1825 of 1826).

## C.    EVALUATIONS

### 1.    PSYCHOLOGICAL EVALUATIONS

Plaintiff underwent his first of five psychological evaluations on October 30, 2007, with Dr. Robert F. Dallara, Jr., Ph.D ("Dr. Dallara") (Docket No. 10, pp. 554-57 of 1826). Plaintiff was cooperative, but did have some difficulties with concentration (Docket No. 10, p. 556 of 1826). Plaintiff's speech was intelligble and spontaneous, although Dr. Dallara noted that Plaintiff occasionally went off on tangents (Docket No. 10, p. 556 of 1826). Dr. Dallara administered the Minnesota Multiphasic Personality Inventory - 2 ("MMPI-2") (Docket No. 10, p. 556 of 1826). Based on these test results, as well as his own observations, Dr. Dallara diagnosed Plaintiff with adjustment disorder with depressed mood and a pain disorder associated with both psychological factors and a general medical condition (Docket No. 10, p. 557 of 1826). Dr. Dallara also assigned Plaintiff a Global

Assessment of Functioning ("GAF") score of fifty[3] (Docket No. 10, p. 557 of 1826). Dr. Dallara

opined that Plaintiff was unlikely to be able "to be employed on a *sustained* basis, as it appear[ed] he

may decompensate during stress" (Docket No. 10, p. 557 of 1826) (emphasis in original). Dr. Dallara

also recommended psychological/psychiatric treatment (Docket No. 10, p. 557 of 1826).

On January 9, 2008, Plaintiff was evaluated by Dr. Donald J. Tosi, Ph.D ("Dr. Tosi") at the

request of the Bureau of Workers' Compensation ("BWC") (Docket No. 10, pp. 1137-44 of 1826).

Plaintiff displayed average intelligence and had a normal stream of thought and flow of ideas (Docket

No. 10, p. 1140 of 1826). His thoughts were clear, understandable, relevant, and goal-directed (Docket

No. 10, p. 1141 of 1826). Plaintiff admitted daily crying spells, but reported some interaction with

family and friends (Docket No. 10, pp. 1141-42 of 1826). Based upon his evaluation, Dr. Tosi

diagnosed Plaintiff with an adjustment disorder with depressed mood, stemming from Plaintiff's 2006

workplace injury (Docket No. 10, p. 1143 of 1826). Dr. Tosi opined that the condition would last from

three to six months and suggested Plaintiff undergo psychotherapy two to three times per month during

this period (Docket No. 10, p. 1144 of 1826).

In conjunction with his BWC claim, Plaintiff saw Dr. Mark G. Tully, Ph.D ("Dr. Tully") on

January 31, 2008 (Docket No. 10, pp. 592-602 of 1826). During the evaluation, Plaintiff expressed a

desire to participate in a job retraining program in order to become qualified for a job that he was

physically capable of performing (Docket No. 10, p. 594 of 1826). Dr. Tully administered two

psychological tests: (1) the Symptom Checklist-90-R ("SCL-90"); and (2) the MMPI-2 (Docket No.

---

[3] The Global Assessment of Functioning Scale is a 100-point scale that measures a patient's
overall level of psychological, social, and occupational functioning on a hypothetical continuum. A score
of 50 indicates serious symptoms or any serious impairment in social, occupational, or school
functioning. THE DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (hereinafter DSM-IV)
34 (Am. Psychiatric Ass'n) (4th ed. 1994).

18

10, p. 597 of 1826). With regard to the SCL-90, Dr. Tully found that Plaintiff approached the test

"with the intent of over-reporting his psychological symptomatology" in a rather dramatic fashion

(Docket No. 10, p. 597 of 1826). In fact, of the nine clinical scales on the test, five of Plaintiff's scores

were in excess of the highest value given (Docket No. 10, p. 597 of 1826). Nearly all of Plaintiff's

scores were in the ninety-ninth percentile (Docket No. 10, p. 597 of 1826). Results of Plaintiff's

MMPI-2 were similar: Plaintiff approached the test "with the intent of conveying an unrealistically

positive impression of himself by not responding truthfully to the test items. In addition, [Plaintiff]

attempted to exaggerate his psychological symptomatology" (Docket No. 10, p. 598 of 1826).

Based on these test results, as well as his observations of Plaintiff, Dr. Tully concluded that

Plaintiff did *not* suffer from adjustment disorder with depressed mood (Docket No. 10, p. 598 of 1826).

Dr. Tully noted that the evidence was also contradictory with respect to Plaintiff's previous diagnosis

of pain disorder associated with both psychological factors and a general medical condition (Docket

No. 10, p. 599 of 1826). Interestingly, Dr. Tully noted that "it was a bit of a mystery why [Plaintiff]

applied for social security disability since he believed he was still capable of working, albeit in a light

duty capacity" (Docket No. 10, p. 602 of 1826).

On June 16, 2009, the BWC referred Plaintiff for another psychological evaluation, this time

with Dr. Michael J. Harvan, Ph.D ("Dr. Harvan") (Docket No. 10, pp. 1647-53 of 1826). During the

evaluation, Plaintiff's prevailing mood was one of moderate depression, displaying a mildly flat affect

(Docket No. 10, p. 1649 of 1826). Plaintiff admitted to crying spells, feelings of depression, and

thoughts of suicide, although he stated that he would never do anything (Docket No. 10, p. 1649 of

1826). Plaintiff was oriented to person, place, time, and situation (Docket No. 10, p. 1650 of 1826). He

was able to follow simple and more complex directions (Docket No. 10, p. 1650 of 1826). Dr. Harvan

19

estimated Plaintiff's level of intellectual functioning to be in the low average range (Docket No. 10, p. 1651 of 1826). Based on his evaluation of Plaintiff, Dr. Harvan diagnosed Plaintiff with adjustment disorder with depressed mood and pain disorder associated with both psychological factors and a general medical condition (Docket No. 10, p. 1652 of 1826). Plaintiff was assigned a GAF score of fifty (Docket No. 10, p. 1652 of 1826). Dr. Harvan found Plaintiff's ability to understand and follow instructions moderately impaired, his ability to maintain attention to perform simple or multi-step repetitive tasks *at most* mildly impaired, his ability to relate to others moderately impaired, and his ability to withstand the stress and pressures associated with day-to-day work activity mildly impaired (Docket No. 10, pp. 1652-53 of 1826).

### 2.    MENTAL RESIDUAL FUNCTIONAL CAPACITY ASSESSMENTS

Plaintiff underwent two Mental Residual Functional Capacity Assessments, the first on April 5, 2008, with state examiner Dr. Kevin Edwards ("Dr. Edwards") (Docket No. 10, pp. 1052-55 of 1826). Dr. Edwards found Plaintiff to be moderately limited in his ability to: (1) understand and remember detailed instructions; (2) carry out detailed instructions; (3) maintain attention and concentration for extended periods; (4) perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; (5) work in coordination with or proximity to others without being distracted by them; (6) complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; (7) interact appropriately with the general public; (8) accept instructions and respond appropriately to criticism from supervisors; and (9) get along with coworkers or peers without distracting them or exhibiting behavioral extremes (Docket No. 10, pp. 1052-53 of 1826).

On July 6, 2009, Plaintiff underwent a Mental Residual Functional Capacity Assessment with

state examiner Dr. Alice Chambly ("Dr. Chambly") (Docket No. 10, pp. 1654-57 of 1826). Dr. Chambly found Plaintiff to be moderately limited in his ability to: (1) carry out detailed instructions; and (2) interact appropriately with the general public (Docket No. 10, pp. 1654-55 of 1826). Dr. Chambly found no evidence of limitations in any other tested category (Docket No. 10, pp. 1654-55 of 1826).

### 3.   PSYCHIATRIC REVIEW TECHNIQUES

On these same dates, Plaintiff underwent Psychiatric Review Techniques with both Dr. Edwards and Dr. Chambly. Dr. Edwards found that Plaintiff suffered from: (1) an adjustment disorder with depressed mood; and (2) pain disorder (Docket No. 10, pp. 1056-62 of 1826). With regard to "Paragraph B"[4] criteria, Dr. Edwards reported that Plaintiff had moderate restriction of activities of daily living, as well as moderate difficulty in maintaining social functioning and concentration, persistence, and pace (Docket No. 10, p. 1066 of 1826). The doctor found no episodes of decompensation or evidence of "Paragraph C"[5] criteria (Docket No. 10, pp. 1066-67 of 1826).

In her Psychiatric Review Technique, Dr. Chambly found that Plaintiff suffered from an adjustment disorder with depressed mood (Docket No. 10, p. 1661 of 1826). In evaluating "Paragraph B" criteria, Dr. Chambly reported that Plaintiff had mild limitation with respect to activities of daily living and maintaining social functioning and moderate limitation in maintaining concentration, persistence, and pace (Docket No. 10, p. 1668 of 1826). Dr. Chambly found no episodes of decompensation or evidence of "Paragraph C" criteria (Docket No. 10, pp. 1068-69 of 1826).

---

[4] Paragraph B criteria "describe impairment-related functional limitations that are incompatible with the ability to do any gainful activity." 20 C.F.R. § 404, Subpart P, Appendix 1, § 12.00(A).

[5] Paragraph C criteria also "describe impairment-related functional limitations that are incompatible with the ability to do any gainful activity." 20 C.F.R. § 404, Subpart P, Appendix 1, § 12.00(A).

4.     **PHYSICAL RESIDUAL FUNCTIONAL CAPACITY ASSESSMENTS**

The first of Plaintiff's three Physical Residual Functional Capacity Assessments took place on January 24, 2008, with physical therapist Kimberly Hurt ("Ms. Hurt") (Docket No. 10, pp. 618-31 of 1826). Ms. Hurt determined that Plaintiff could: (1) stoop, kneel, climb stairs, reach immediately and overhead with his left arm, reach with weight, handle with his left arm, and engage in fine motor skills with both hands on a *constant* basis; (2) walk, carry up to ten pounds, crouch, reach immediately with his right arm, handle with his right arm, sit, and stand on a *frequent* basis; and (3) carry up to thirty pounds, balance, and reach overhead with his right arm on an *occasional* basis (Docket No. 10, p. 620 of 1826). Ms. Hurt also noted that Plaintiff could low-lift ten pounds frequently and thirty pounds occasionally, and mid-to-high lift up to ten pounds occasionally (Docket No. 10, p. 620 of 1826). Plaintiff demonstrated functional, but low, bilateral grip strength (Docket No. 10, p. 620 of 1826). Ms. Hurt recommended that Plaintiff return to work with some restrictions, including: (1) working at the light to medium level; (2) doing only self-paced lifting and carrying activities; (3) no repetitive and/or overhead reaching or lifting with the right upper extremity; (4) allowances for rest breaks and postural changes as needed; and (5) allowance for strategies to self-manage reported symptoms in the workplace (Docket No. 10, p. 620 of 1826).

On April 7, 2008, Plaintiff underwent a Physical Residual Functional Capacity Assessment with state examiner Dr. Teresita Cruz ("Dr. Cruz") (Docket No. 10, pp. 1070-78 of 1826). Dr. Cruz found that Plaintiff could: (1) occasionally lift and/or carry twenty pounds; (2) frequently lift and/or carry ten pounds; (3) stand and/or walk for six hours during an eight-hour workday; (4) sit for a total of six hours during an eight-hour workday; (5) engage in unlimited pushing and pulling; and (6) occasionally stoop (Docket No. 10, p. 1071 of 1826). Plaintiff could never climb ladders, ropes, or

22

scaffolds (Docket No. 10, p. 1072 of 1826). Dr. Cruz also determined that Plaintiff should only engage in limited reaching, including overhead (Docket No. 10, p. 1073 of 1826). Plaintiff had no visual or communicative limitations, but was advised to avoid all hazards such as machinery and heights (Docket No. 10, pp. 1073-74 of 1826).

On July 23, 2009, state examiner Dr. Gerald Klyop ("Dr. Klyop") made identical findings to those of Dr. Cruz with regard to Plaintiff's ability to lift and/or carry, stand, sit, push and/or pull, climb ladders, ropes, and scaffolds, and reach (Docket No. 10, pp. 1673-75 of 1826). Dr. Klyop also determined that Plaintiff had no visual or communicative limitations, but should avoid all exposure to hazards such as machinery and heights (Docket No. 10, pp. 1675-76 of 1826).

## IV. STANDARD OF DISABILITY

The Commissioner's regulations governing the evaluation of disability for DIB and SSI are identical for purposes of this case, and are found at 20 C.F.R. §§ 404.1520 and 416.920. *Colvin v. Barnhart,* 475 F.3d 727, 730 (6th Cir. 2007). DIB and SSI are available only for those who have a "disability." 42 U.S.C. § 423(a), (d); *see also* 20 C.F.R. § 416.920. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Colvin*, 475 F.3d at 730 (*citing* 42 U.S.C. § 423(d)(1)(A)) (definition used in the DIB context); *see also* 20 C.F.R. § 416.905(a) (same definition used in the SSI context).

The Commissioner uses a five-step sequential evaluation process to evaluate a DIB or SSI claim. First, a claimant must demonstrate he is not engaged in "substantial gainful activity" at the time he seeks disability benefits. *Colvin*, 475 F.3d at 730 (*citing Abbott v. Sullivan*, 905 F.2d 918, 923 (6th

23

Cir. 1990)).  Second, a claimant must show he suffers from a "severe impairment." *Colvin*, 475 F.3d at

730. A "severe impairment" is one which "significantly limits . . . physical or mental ability to do

basic work activities." *Id*. (*citing Abbott,* 905 F. 2d at 923).  At the third step, a claimant is presumed to

be disabled regardless of age, education, or work experience if he is not engaged in substantial gainful

activity, has a severe impairment that is expected to last for at least twelve months, and the impairment

meets the requirements of a "listed" impairment. *Colvin*, 475 F.3d at 730.

Prior to considering step four, the Commissioner must determine a claimant's residual

functional capacity. 20 C.F.R. §§ 404.1520(e), 416.920(e). An individual's residual functional capacity

is an administrative "assessment of [the claimant's] physical and mental work abilities – what the

individual can or cannot do despite his or her limitations." *Converse v. Astrue*, 2009 U.S. Dist. LEXIS

126214, *16 (S.D. Ohio 2009); *see also* 20 C.F.R. § 404.1545(a). It "is the individual's *maximum*

remaining ability to do sustained work activities in an ordinary work setting on a **regular and**

**continuing** basis . . . A regular and continuing basis means 8 hours a day, for 5 days a week, or an

equivalent work schedule." *Converse*, 2009 U.S. Dist. LEXIS 126214 at *17 (*quoting SSR* 96-8p, 1996

SSR LEXIS 5 (July 2, 1996) (emphasis in original) (internal citations omitted)).The Commissioner

must next determine whether the claimant has the residual functional capacity to perform the

requirements of his past relevant work. 20 C.F.R. §§ 404.1520(f), 416.920(f). If he does, the claimant

is not disabled.

Finally, even if the claimant's impairment does prevent him from doing past relevant work, the

claimant will not be considered disabled if other work exists in the national economy that he can

perform.  *Colvin*, 475 F.3d at 730 (*citing Heston v. Comm'r of Soc. Sec*., 245 F.3d 528, 534 (6th Cir.

2001) (internal citations omitted) (second alteration in original)). A dispositive finding by the

Commissioner at any point in the five-step process terminates the review. *Colvin*, 475 F.3d at 730

(*citing* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4)).

## V. The Commissioner's Findings

After careful consideration of the disability standards and the entire record, ALJ Wilkerson

made the following findings:

1. Plaintiff last met the insured status requirements of the Social Security Act on September 30, 2009.

2. Plaintiff did not engage in substantial gainful activity during the period from his alleged onset date of December 3, 2007, through his date last insured of September 30, 2009.

3. Through the date last insured, Plaintiff had the following severe impairments: status post two right rotator cuff surgeries, adjustment disorder with depressed mood, and pain disorder associated with both psychological factors and a general medical condition.

6. Through the date last insured, Plaintiff did not have an impairment or combination of impairments that meets or medically equals any of the impairments listed in 20 CFR Part 404, Subpart P, Appendix 1.

7. Through the date last insured, Plaintiff had the residual functional capacity to perform light work except that Plaintiff cannot: (1) climb ladders, ropes, or scaffolds; (2) kneel or squat; (3) perform any overhead reaching with his dominant upper right extremity; or (4) work in an environment where the temperature is below forty-five degrees. Plaintiff must avoid all exposure to hazards. Plaintiff can perform simple, routine tasks in a stable environment with occasional, superficial interaction with others. Plaintiff cannot lift more than two pounds with his dominant right hand and cannot perform any job that requires sustained use of his dominant right hand. Plaintiff must avoid concentrated exposure to vibrations and must be able to sit down for ten minutes every hour.

8. Through the date last insured, Plaintiff was unable to perform any past relevant work.

9. Plaintiff was born on August 4, 1955, and was 54 years old, which is defined as an individual closely approaching advanced age, on the date last insured.

10. Plaintiff has at least a high school education and is able to communicate in English.

11.     Transferability of job skills is not material to the determination of disability because the Medical-Vocational Rules support a finding that the Plaintiff is "not disabled" whether or not the Plaintiff has transferable job skills.

12.     Through the date last insured, considering Plaintiff's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that Plaintiff could have performed.

13.     Plaintiff was not under a disability, as defined in the Social Security Act, at any time from December 3, 2007, the alleged onset date, through September 30, 2009, the date last insured.

(Docket No. 10, pp. 24-35 of 1826). ALJ Wilkerson denied Plaintiff's request for DIB (Docket No. 10, p. 35 of 1826).

## VI. STANDARD OF REVIEW

This Court exercises jurisdiction over the final decision of the Commissioner pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3).  *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 832-33 (6th Cir. 2006).  In conducting judicial review, this Court must affirm the Commissioner's conclusions unless the Commissioner failed to apply the correct legal standard or made findings of fact that are unsupported by substantial evidence.  *Id.* (*citing Branham v. Gardner*, 383 F.2d 614, 626-27 (6th Cir. 1967)).  "The findings of the [Commissioner] as to any fact if supported by substantial evidence shall be conclusive . . ." *McClanahan*, 474 F.3d at 833 (*citing* 42 U.S.C. § 405(g)). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *McClanahan*, 474 F.3d at 833 (*citing Besaw v. Sec'y of Health and Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992)).  "The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion . . . This is so because there is a 'zone of choice' within which the Commissioner can act, without the fear of court

26

interference." *McClanahan*, 474 F.3d at 833 (*citing Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001) (citations omitted)).

## VII. DISCUSSION

### A.   PLAINTIFF'S ALLEGATIONS

In his Brief on the Merits, Plaintiff alleges that: (1) the ALJ committed reversible error by not finding Plaintiff's migraine headaches to be a severe impairment and by failing to include additional limitations in the residual functional capacity assessment to account for Plaintiff's headaches; (2) the ALJ failed to include all relevant impairments in his hypothetical questions; and (3) the ALJ relied upon flawed VE testimony that cited jobs that did not match the given residual functional capacity assessment (Docket No. 14).

### B.   DEFENDANT'S RESPONSE

Defendant disagrees and argues that substantial evidence supported the ALJ's finding that Plaintiff's headaches were not a severe impairment (Docket No. 15). Defendant also maintains that the ALJ reasonably accounted for Plaintiff's established mental health limitations and provided the VE with proper hypothetical questions that included all of Plaintiff's alleged impairments for which there was substantial evidence (Docket No. 15).

### C.   DISCUSSION

#### 1.   MIGRAINE HEADACHES AS A SEVERE IMPAIRMENT

Plaintiff alleges that the ALJ erred by failing to find Plaintiff's migraine headaches to be a severe impairment (Docket No. 14, pp. 10-12 of 18). Defendant counters that there exists substantial evidence supporting the ALJ's determination (Docket No. 15, pp. 12-13 of 20).

To be severe, an impairment or combination of impairments must significantly limit a

claimant's physical or mental ability to perform basic work activities. 20 C.F.R. §§ 404.1527(c), 416.920(c). An impairment qualifies as "*not* severe only if it is a slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience." *Salmi v. Sec'y of Health & Human Servs.*, 774 F.2d 685, 691 (6th Cir. 1985) (*quoting Brady v. Heckler*, 724 F.2d 914, 920 (11th Cir. 1984)) (emphasis added). The claimant bears the burden of proving the severity of his impairments. *Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988). Although the record does contain evidence that Plaintiff was treated for migraine headaches, it simply does not contain *enough* evidence to support Plaintiff's assertion that these headaches result in more than a minimal effect on his ability to do basic work activities (Docket No. 10, pp. 26-27 of 1826).

Plaintiff first complained of headaches to Dr. Pansino on May 9, 2008 (Docket No. 10, p. 1687 of 1826). Suspecting that these headaches could be migraines, Dr. Pansino started Plaintiff on ten milligrams of Maxalt (Docket No. 10, p. 1687 of 1826). When Plaintiff returned to Dr. Pansino for a follow-up appointment on June 6, 2008, records show that Plaintiff was doing well on the Maxalt and had not had any further headaches (Docket No. 10, p. 1686 of 1826). The next mention of Plaintiff's headaches came nearly ten months later, on April 29, 2009, when Plaintiff returned to Dr. Pansino complaining of headaches and right shoulder pain (Docket No. 10, p. 284 of 1826). Records from that appointment indicate that Plaintiff was out of his Maxalt and received a prescription refill (Docket No. 10, p. 284 of 1826). By May 27, 2009, Plaintiff was reporting that the Maxalt was "working well" in controlling his headaches (Docket No. 10, p. 1684 of 1826). As of January 14, 2010, Plaintiff's headaches were stable (Docket No. 10, p. 1803 of 1826). Although Plaintiff testified that he gets headaches every month which require him to lay down in a dark room (Docket No. 10, p. 74 of 1826),

28

the record does not support this assertion. The transcript in this case is more than 1,800 pages long, of which more than 1,500 pages is Plaintiff's medical record (Docket No. 10). Although there is some duplication of records, mention of Plaintiff's migraine headaches is found on only *five* pages of this record (Docket No. 10, pp. 74, 284, 1686, 1687, 1803 of 1826). That alone is enough to give the ALJ, and this Magistrate, pause in finding Plaintiff's migraine headaches to be a severe impairment.

Even assuming Plaintiff is correct and the ALJ *did* err by finding Plaintiff's migraine headaches non-severe at step two, such error is harmless. Step two of the sequential evaluation process is a "de minimis hurdle in the disability determination process" that is intended "to screen out totally groundless claims." *Knox v. Astrue*, 2011 U.S. Dist. LEXIS 23611, *24 (N.D. Ohio Mar. 9, 2011). Once an ALJ determines the claimant suffers from *any* severe impairment at step two, the analysis automatically proceeds to step three. *Id*. Failure "to identify other impairments, or combinations of impairments, as severe in step two would only be harmless error." *Id*. at *24-25 (*citing Anthony v. Astrue*, 266 Fed. Appx. 451, 457 (6th Cir. 2008)).

Here, ALJ Wilkerson found Plaintiff suffered from three impairments: status post two right rotator cuff surgeries, adjustment disorder with depressed mood, and pain disorder associated with both psychological factors and a general medical condition (Docket No. 10, p. 26 of 1826). Therefore, Plaintiff's application for disability automatically proceeded to step three (Docket No. 10, p. 27 of 1826). The ALJ's failure to find Plaintiff's alleged migraine headaches to be severe is irrelevant and resulted in only harmless error.

Given the lack of support for Plaintiff's claim of migraine headaches as a severe impairment, this Magistrate finds that Plaintiff's first assignment of error lacks merit and recommends that the decision of the Commissioner be affirmed.

2.      HYPOTHETICAL QUESTION

Plaintiff next alleges that the ALJ failed to pose a hypothetical question based on the substantial evidence contained in the record (Docket No. 12, pp. 12-15 of 18). Specifically, Plaintiff alleges that the VE's testimony was flawed because the ALJ failed to include Plaintiff's limitations regarding concentration, persistence, and pace in the hypothetical question (Docket No. 14, p. 14 of 18).

In the Sixth Circuit, in order to be considered substantial evidence, a VE's testimony must be based on a hypothetical question which accurately portrays the claimant's physical and mental impairments. *See Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987). However, it is also "well established that an ALJ . . . is required to incorporate only those limitations accepted as credible by the finder of fact" into the hypothetical question. *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993).

Here, ALJ Wilkerson's hypothetical questions restricted Plaintiff to light work and posed a number of limitations, including no: (1) climbing of ladders, ropes, or scaffolds; (2) squatting or kneeling; (3) overhead reaching with the dominant right upper extremity; (4) work in temperatures below forty-five degrees; (5) exposure to hazards; (6) lifting over two pounds with the dominant right hand; (7) sustained use of the dominant right arm; and (8) concentrated exposure to vibration (Docket No. 10, p. 80 of 1826). ALJ Wilkerson also included that the hypothetical person would need to be able to sit down for ten minutes every hour and would only "be able to perform simple, routine tasks in a stable environment, with occasional superficial interaction with others" (Docket No. 10, p. 80 of 1826).

Plaintiff alleges that the ALJ failed to include, in either the hypothetical question or the final

30

residual functional capacity finding, Plaintiff's need for speed- or pace-based restrictions (Docket No. 14, p. 14 of 18). Plaintiff had numerous psychological evaluations and mental residual functional capacity assessments (Docket No. 10, pp. 279-1826 of 1826). In October 2007, Dr. Dallara found that Plaintiff had some difficulties with concentration and would be unlikely "to be employed on a *sustained* basis, as it appears [Plaintiff] may decompensate during stress" (Docket No. 10 pp. 556-57 of 1826) (emphasis in original). In early January 2008, Dr. Tosi found Plaintiff to have only *mild* difficulties with overall concentration and attention (Docket No. 10, p. 1140 of 1826). Dr. Tosi noted that Plaintiff was not distracted with his pain or medications (Docket No. 10, p. 1140 of 1826). By late January 2008, Dr. Tully found Plaintiff to have adequate attention, concentration, and gross cognitive functioning (Docket No. 10, p. 597 of 1826). Even more telling was Plaintiff's stated belief, during Dr. Tully's examination, that his "attention, concentration, drive and motivation were sufficient to be able to successfully participate" in vocational training (Docket No. 10, p. 600 of 1826).  In June 2009, Dr. Harvan reported that Plaintiff "had no difficulty focusing attention and concentration" (Docket No. 10, p. 1652 of 1826). Dr. Harvan went on to opine that Plaintiff

> performed the As test without error. He followed simple and more complex directions. He repeated words and phrases. He was able to mentally solve arithmetic problems. His pace was somewhat slowed. His speech and problem-solving process was noted to be slightly delayed. He did persist at tasks. [Plaintiff's] ability to maintain attention to perform simple or multi-step repetitive tasks is at most *mildly* impaired.

(Docket No. 10, p. 1652 of 1826) (emphasis added).

During his first Psychiatric Review Technique with Dr. Edwards in April 2008, Plaintiff was found to have *moderate* difficulties in maintaining concentration, persistence, and pace (Docket No. 10, p. 1068 of 1826). By his second Psychiatric Review Technique in July 2009, Dr. Chambly found Plaintiff to have only *mild* difficulties in maintaining concentration, persistence, and pace (Docket No.

10, p. 1668 of 1826). Although each examiner found Plaintiff to have at least a mild restriction with regard to concentration, persistence, and pace, *none* of the examiners placed any speed- or pace-based restrictions on Plaintiff's abilities (Docket No. 10, pp. 279-1826 of 1826).

Plaintiff would have this Court follow the holding of the Sixth Circuit found in *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 516-17 (6th Cir. 2010) (Docket No. 14, pp. 12-15 of 18). In *Ealy*, the ALJ fully adopted the opinion of one of the plaintiff's examiners which limited the plaintiff's ability "to sustain attention to complete simple repetitive tasks to two-hour segments over an eight-hour day where speed was not critical." 594 F.3d at 516 (internal citations omitted). However, the ALJ failed to include these speed- and pace-based restrictions in the hypothetical he posed to the VE. *Id*. The Court found that the hypothetical posed by the ALJ "should have included the restriction that [the plaintiff] could work two-hour work segments during an eight-hour work day, and that speed of his performance could not be critical to his job. Accordingly, [the plaintiff's] limitations were not fully conveyed to the vocational expert." *Id*. The Sixth Circuit therefore remanded the plaintiff's case. *Id*. at 517.

As Defendant has correctly noted, *Ealy* stands only "for a limited, fact-based, ruling in which the claimant's particular moderate limitations required additional speed- and pace-based restrictions." *Jackson v. Comm'r of Soc. Sec.*, 2011 U.S. Dist. LEXIS 120476, *11 (N.D. Ohio, Oct. 18, 2011). Given the lack of *specific* speed- or pace-based restrictions in the record, Plaintiff fails to adequately explain why ALJ Wilkerson should have included more detailed limitations in his hypothetical question to account for Plaintiff's alleged difficulty with concentration, persistence, or pace (Docket No. 14, p. 14 of 18). Plaintiff simply makes the blanket statement that the "ALJ's controlling hypothetical question was defective, as was the RFC he found because neither the question nor the RFC included speed- or pace-based restrictions, as is required when an individual is found to have

32

moderate limitations in concentration, persistence or pace" (Docket No. 14, p. 14 of 18).

Furthermore, as both the ALJ and Defendant note, the evidence weighs against including any such limitation. First and foremost, in the more than 1,500 pages of medical evidence submitted, no where is there any evidence of Plaintiff's psychological treatment (Docket No. 10, pp. 279-1826 of 1826). Although Dr. Tosi opined that Plaintiff would benefit from brief psychotherapy (Docket No. 10, p. 1144 of 1826), there is no evidence in the record that Plaintiff sought such treatment (Docket No. 10, pp. 279-1826 of 1826). Although Plaintiff testified that he has difficulty concentrating and keeping on task (Docket No. 10, p. 70 of 1826), he also testified that he drives, attends his childrens' sporting events, does some chores around the house, mows his grass, does the laundry, and cooks (Docket No. 10, pp. 66-70 of 1826). During his 2008 evaluation with Dr. Tully, Plaintiff indicated that his "attention, concentration, drive and motivation were sufficient enough to successfully participate" in a job retraining program (Docket No. 10, p. 594 of 1826). In fact, Plaintiff *did* participate in vocational rehabilitation services from February 25, 2008, through September 25, 2008, during which he completed computer training, worked with a career counselor, and pursued job leads (Docket No. 10, pp. 1190-1335 of 1826). Plaintiff quit the program after successfully finding a job at Walmart in late September 2008 (Docket No. 10, p. 1333 of 1826). Finally, it is worth mentioning that Dr. Tully commented that "it was a bit of a mystery why [Plaintiff] applied for social security disability since he believed he was still capable of working, albeit in a light duty capacity" (Docket No. 10, p. 602 of 1826). Plaintiff seemed to agree with this opinion, testifying that he could have continued working on light duty for J&J Refuse had he not been terminated (Docket No. 10, pp. 53-54, 67-68 of 1826).

Based on the evidence contained in the record, the Magistrate finds that Plaintiff's second assignment of error lacks merit and recommends that the decision of the Commissioner be affirmed.

3.     VOCATIONAL EXPERT TESTIMONY

Finally, Plaintiff alleges that the ALJ relied upon flawed testimony because the VE cited "other work" that Plaintiff could perform which required abilities outside the parameters outlined in the ALJ's residual functional capacity assessment (Docket No. 14, pp. 15-18 of 18). Specifically, Plaintiff alleges that the jobs identified by the VE, gate tender and security guard, cannot be performed with only "occasional, superficial social interaction," as required by ALJ Wilkerson's residual functional capacity assessment. Defendant disagrees, stating that the VE provided his opinion based on both the ALJ's given limitations and the DOT (Docket No. 15, pp. 18-20 of 20).

The Sixth Circuit has held, in accordance with S.S.R. 00-04p, that when making a disability determination, an ALJ is

> permitted to consider reliable job information available from various publications as evidence of the claimant's ability to do other work that exists in the national economy. Such publications include the DOT, which provides information about jobs (classified by their exertional and skill requirements) that exist in the national economy. ALJs are also authorized to consider the testimony of so-called vocational experts . . . as a source of occupational evidence.

> On occasion, a VE's testimony conflicts with the information set forth in the DOT. In an effort to insure that such actual or apparent conflicts are addressed, the Social Security Administration has imposed an affirmative duty on ALJs to ask the VE if the evidence that he or she has provided conflicts with the information provided in the DOT. ALJs must also obtain a reasonable explanation for apparent conflict[s] if the VE's evidence appears to conflict with the DOT.
> . . .

> Nothing in S.S.R. 00-04p . . . places an affirmative duty on the ALJ to conduct an independent investigation into the testimony of witnesses to determine if they are correct.

*Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 603-06 (6th Cir. 2009).

Here, ALJ Wilkerson *twice* asked VE Macy if his opinions were consistent with the DOT: once before the VE gave his testimony and once after (Docket No. 10, pp. 75, 82-83 of 1826). Both times,

34

VE Macy indicated that his testimony was consistent with the DOT (Docket No. 10, pp. 75, 82-83 of 1826). ALJ Wilkerson satisfied his obligation with regard to the VE's testimony. As stated above, the ALJ had no *affirmative* duty to conduct his own independent investigation of the VE's testimony to determine if it was correct. *Lindsley*, 560 F.3d at 606.

Furthermore, Plaintiff's counsel had ample opportunity to raise the alleged discrepancy between the DOT and VE Macy's testimony during cross-examination. Counsel did not even question the VE about the "occasional, superficial interaction" limitation (Docket No. 10, pp. 83-88 of 1826). Rather, counsel posed an entirely different limitation to the VE, limiting the hypothetical person to *no* contact with the public (Docket No. 10, p. 86 of 1826). In response to *that* limitation, the VE indicated that neither the gate tender position or the security guard position would be available (Docket No. 10, p. 86 of 1826).

Plaintiff is correct in that counsel concentrated more heavily on the ALJ's limitation of "no sustained used of the right hand" (Docket No. 10, p. 84 of 1826). The VE testified that he took "sustained" to mean "at least occasional" (Docket No. 10, p. 84 of 1826). Plaintiff is also correct that the DOT defines the job of security guard to involve "frequent" reaching and handling (Docket No. 14, Attachment 2, p. 4 of 5). However, as stated above, the VE testified that his answers were consistent with the DOT (Docket No. 10, pp. 75, 82-83 of 1826). The ALJ had no obligation to inquire further. *Lindsley*, 560 F.3d at 606. Furthermore, counsel did not object to the VE's opinion during the hearing. Rather, counsel simply stated, during his closing argument, that he was "somewhat surprised by some of the [VE's] responses" (Docket No. 10, p. 87 of 1826). Additionally, the Sixth Circuit has noted that "the DOT's job classifications are collective descriptions of 'occupations' that can encompass numerous jobs . . . Within occupations . . . there may be variations among jobs performed for different

35

employers." *Lindsley*, 560 F.3d at 605. It is entirely possible that Plaintiff could perform work as a security guard in a position that requires only "occasional" reaching and handling.

Therefore, Plaintiff's third assignment of error lacks merit and the Magistrate recommends that the decision of the Commissioner be affirmed.

### VIII.  CONCLUSION

For the foregoing reasons, the undersigned Magistrate recommends that the decision of the Commissioner be affirmed.

/s/Vernelis K. Armstrong
United States Magistrate Judge

Date:  April 12, 2013

## IX. NOTICE

Please take notice that as of this date the Magistrate's report and recommendation attached hereto has been filed. Pursuant to Rule 72.3(b) of the LOCAL RULES FOR NORTHERN DISTRICT OF OHIO, any party may object to the report and recommendations within fourteen (14) days after being served with a copy thereof. Failure to file a timely objection within the fourteen-day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure. The objecting party shall file the written objections with the Clerk of Court, and serve on the Magistrate Judge and all parties, which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. Any party may respond to another party's objections within fourteen days after being served with a copy thereof.

Please note that the Sixth Circuit Court of Appeals determined in *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981) that failure to file a timely objection to a Magistrate's report and recommendation foreclosed appeal to the court of appeals. In *Thomas v. Arn*, 106 S.Ct. 466 (1985), the Supreme Court upheld that authority of the court of appeals to condition the right of appeal on the filing of timely objections to a report and recommendation.